UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>NATHANIEL CRAWFORD,<br><br>Defendant. | 4:22-CR-40052-KES<br><br>AMENDED<br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Nathaniel Crawford is before the court on an indictment charging him with possession of a firearm by a prohibited person. See Docket No. 1. The indictment recites two grounds for the prohibition on possessing firearms: (1) a prior felony conviction and (2) a prior misdemeanor conviction of a crime of domestic violence. Id. Mr. Crawford has filed a motion to suppress certain evidence. See Docket No. 31. The United States ("government") resists the motion. See Docket No. 33. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 57.11.

## FACTS

An evidentiary hearing was held on August 3, 2022. Mr. Crawford was there in person along with his lawyer, Assistant Federal Public Defender Amanda Kippley. The government was represented by its Special Assistant United States Attorney, Elizabeth Ebert. Five witnesses testified and eight exhibits were received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

Prior to the events giving rise to the charges in this case, there was a bulletin out for the arrest of Mr. Crawford for an aggravated assault against Christina Bryant, his ex-girlfriend, which allegedly occurred on January 28, 2022. Mr. Crawford was alleged to have committed the assault with a metal pipe that he used to beat Ms. Bryant. Officer Michelle Smith testified that the bulletin notified police officers that they had probable cause to arrest Mr. Crawford for this assault if they encountered him.

Eight days later, on February 5, 2022, three calls were made to dispatch for the Sioux Falls Police Department. All of the relevant information reported to dispatch regarding the events of February 5 involving Mr. Crawford were available to all the officers involved in the events of that night. The information relayed by dispatch to the officers is contained in Exhibit 5, which officers referred to as a "CAD."

The CAD told officers that a third party reported to police dispatch that a black male in a red Trailblazer was outside yelling that he was going to shoot someone's house. Exhibit No. 5 at p. 2, at 20:05:14. This third party reported

that a male was yelling at a female who was in the car with him, yelling that he was going to shoot someone. Id. at 20:06:59. The reporting person did not see any weapons, but stated the male said he had a gun. Id. at 20:07:29. In response to this call, Officer Michelle Smith of the Sioux Falls Police Department proceeded en route to the scene of the call, which was an apartment building in the 300 block of North Spring Avenue in Sioux Falls, South Dakota.

While en route, a second third party contacted police dispatch and reported there was a black male in a Cherokee outside their apartment building arguing with neighbors in apartment number 1. Id. at 20:10:36. The male stated he was going to burn the place down and then left at a very high rate of speed. Id. Officer Smith had this information before arriving at the apartment complex.

At the apartment complex, Officer Smith spoke to Christina Bryant. Ms. Bryant told Officer Smith that Mr. Crawford had previously beat her with a metal pipe. He came to Ms. Bryant's apartment and was making verbal threats about a gun, but Ms. Bryant downplayed this threat, stating she did not see a gun and Mr. Crawford was not known to carry a gun. Officer Smith instructed Ms. Bryant to call her back if Mr. Crawford returned to her apartment. Officer Smith then left and drove to a quiet spot a short distance away where she began typing up her report on the call and looking up information about the January 28 assault. During this interlude, Officer Smith discovered the bulletin authorizing Mr. Crawford's arrest for the January 28 assault.

At 20:37:48 Ms. Bryant called 911 again. Exhibit 5 at p. 2, 20:37:48. Dispatch reported that Ms. Bryant had said that Mr. Crawford was right outside her door with a gun.[1] Id. at 20:37:57. Officer Smith returned to the apartment complex. Id. at p. 3, 20:38:43. Other officers also arrived and they, along with Officer Smith, looked around the area for Mr. Crawford. Ms. Bryant stated Mr. Crawford was wearing blue jeans and a white t-shirt and that he left in a red Trailblazer, but did not know where he went to.

Officer Smith radioed to other officers that there was a bulletin authorizing Mr. Crawford's arrest, that he had possibly been back at the reporting person's apartment with a firearm, and that he was in a red Chevy Trailblazer. Id. at 20:39:17, 20:42:06. Within a few minutes, Sergeant Harris radioed that he had located Mr. Crawford at the northwest corner of the parking lot for the Minnehaha County administration building, just a few blocks from Ms. Bryant's apartment complex.

Sergeant Harris did not testify at the hearing, but the first officer who arrived on scene after Harris had stopped Mr. Crawford was Officer Grant Vanvoorst, who did testify. Officer Vanvoorst is a K-9 officer and he arrived with his dog, Hugo, at 20:42:38. Id. at 20:42:38. Mr. Crawford was just pulling his vehicle into a parking spot in the lot when Officer Vanvoorst arrived.

---

[1] There was some suggestion that dispatch did not accurately report what Ms. Bryant said when she called in the second time. The court reports what dispatch said because that is the relevant information police were working off of.

Officer Vanvoorst testified that Hugo is a dual-purpose dog.  He is trained in apprehension of subjects as well as detecting drugs.  Officer Vanvoorst got Hugo out of his patrol vehicle in the event the dog was needed to apprehend Mr. Crawford or to neutralize any danger he might pose.  When Mr. Crawford exited his vehicle, another officer gave him commands and Mr. Crawford obeyed those commands.  Seeing no further need for Hugo, Officer Vanvoorst restored the dog to his patrol vehicle.

Officers Robert Olson, Jason Banik and Samuel Buhr all arrived on scene at 20:43:30.  Exh. 2 at 20:43:30; Exh. 3 at 20:43:30; Exh. C at 20:43:30.  Mr. Crawford was outside his vehicle at this point, but he had not yet been handcuffed.  Id. Officer Vanvoorst together with Officers Olson and Buhr checked Mr. Crawford's vehicle to see if there were any other persons inside the vehicle.  Exh. 2 at 20:44:49.  When they discovered the vehicle was unoccupied, they gave the other officers an "all clear."  Id. at 20:44:56.

While this was going on, Mr. Crawford was handcuffed with Officer Banik's help.  Exh. C. at 20:43:33.  Someone asked Mr. Crawford if he had any weapons on him.  Id. 20:44:50.  He replied "no."  Id.  Officer Buhr approached and asked Mr. Crawford "where's the gun at man?"  Id. at 20:45:31; Exh. 3 at 20:45:31.  Mr. Crawford denied having a firearm.  Id.  Officer Buhr asked Mr. Crawford if he could check his vehicle for firearms, but Mr. Crawford said "no."  Exh. 2 at 20:45:44.

Officer Olson remarked that Mr. Crawford's vehicle smelled "like weed" and they could probably search the vehicle based on that fact.  Exh. 2 at

5

20:45:52. At the hearing in this matter, Officers Vanvoorst and Buhr also testified that they smelled the odor of marijuana emanating from the driver's side of Mr. Crawford's vehicle. Officer Buhr then asked Mr. Crawford if he had a medical marijuana card, and Mr. Crawford replied "no." Exh. 2 at 20:46:07.

There were two cars parked one parking space away from Mr. Crawford's vehicle on the passenger side; there were no vehicles parked anywhere in view on any of the videos on the driver's side of Mr. Crawford's vehicle. Although Officer Olson testified it might be "possible" that the smell emanated from one of the other cars, he said the smell became "exponentially stronger" next to the driver's side door of Mr. Crawford's vehicle. Officer Vanvoorst testified that the other cars in the vicinity were on the passenger side of Mr. Crawford's vehicle, not the driver's side where the smell was detected.

Although Hugo is also trained as a drug detection dog, Officer Vanvoorst did not have Hugo sniff Mr. Crawford's vehicle prior to searching it because Hugo is not trained to detect the smell of marijuana. When it looked like marijuana might be legalized in South Dakota, the decision was made not to train Hugo to detect marijuana. If the dog had been so trained, his drug detection skills would be "null and void" if marijuana became legal according to Officer Vanvoorst. There are two drug detection dogs in the Sioux Falls Police Department who are trained to detect marijuana, but neither of these K-9s were called to the scene. All three officers testified they are trained to recognize the smell of marijuana and that they indeed detected it coming from Mr. Crawford's vehicle.

Officer Olson approached Mr. Crawford's vehicle and began peering through the closed windows. Exh. 2 at 20:46:05. Bending down and peering through the driver's side window, Officer Olson saw the hand grip of a firearm visible through the slightly open cover of the center counsel. Id. at 20:46:20. He called Officer Buhr over and asked him to confirm that was what Officer Olson was seeing. Id. at 20:46:23. When Officer Buhr approached, Officer Olson said, "in that console, see the wooden grip?" Id. at 20:46:32. Officer Buhl confirmed it was a gun. Id. at 20:46:41; Exh. 3 at 20:46:37. Other officers can be heard stating that the smell of marijuana gave them probable cause to search. Id.

Officer Smith arrived on scene at 20:46. See Exhibit 1 at 20:46. By this time, Mr. Crawford was already handcuffed. Officer Smith approached Mr. Crawford and spoke to him. Another officer approached Mr. Crawford and removed his vehicle keys from his pocket. Id. at 20:47. Officer Smith told Mr. Crawford he was under arrest for aggravated assault. Id. at 20:47:12.

Officer Olson used the keys to open the driver's side door to Mr. Crawford's vehicle and the officers confirmed there was a gun in the console. Exh. 2 at 20:47:43. Officer Olson asked Officer Buhr to take photos. Id. The officers first lifted the lid on the console, then replaced the lid as it was when Officer Olson first spied the gun grip and took photos. Officer Buhr, who took the photos, testified there was no material difference between the appearance of the console lid and the gun from when he first saw those items through the locked window and when he took the photos in Exhibit 4. He

7

testified that Exhibit 4 was a true and accurate depiction of what he saw when he looked through the locked door of Mr. Crawford's car. The gun was a .38 special that was loaded with five rounds of ammunition.

Officer Banik conducted a pat-down search of the exterior of Mr. Crawford's person and then placed him in the back seat of his patrol vehicle. Exh. C. at 20:49:17. Officer Smith tried to read Mr. Crawford his Miranda rights while he was seated in the car, but Mr. Crawford would not let her continue, so Officer Smith did not question him. Exh. 1 at 20:50:42 to 51:02.

At 20:52:53 Officer Smith called Ms. Bryant back on her phone and questioned her about the second time Mr. Crawford came back to her apartment. Exh. 1 at 20:52:53. Ms. Bryant told Officer Smith that she did not *see* a gun in Mr. Crawford's possession, but speaking to him through the door of her apartment, she heard him accusing her of pointing a gun at Mr. Crawford's sister and heard a "click-click." Id. at 20:54:06 to :16. In response to a question from Officer Smith, Ms. Bryant said she assumed the click was a gun. Id. at 20:55:16 to :20. Ms. Bryant said Mr. Crawford made her afraid. Id. at 20:55:48.

After this phone call with Ms. Bryant, Officer Smith concluded she had probable cause to arrest Mr. Crawford for domestic violence intimidation. She communicated this fact to the other officers in the parking lot and asked them to enter the gun into evidence under the new charge rather than the January 28 charge. Exh. 1 at 21:01:02. She also called the officers who were taking

8

Mr. Crawford to the jail to be booked and let them know she was opening a new case for domestic violence intimidation and possibly another charge for being a felon in possession of a firearm depending on what was discovered regarding Mr. Crawford's criminal history. Id. at 21:02:05.

When Officer Banik booked Mr. Crawford into the jail, he did not request that any blood or urine be taken to be tested for drugs.

Mr. Crawford moves to suppress the gun found in his vehicle on the grounds that the search of his vehicle violated his Fourth Amendment rights. See Docket No. 32 at pp. 6-9. He also seeks to suppress all statements he made to law enforcement as fruit of the poisonous tree of that Fourth Amendment violation. Id. at p. 9. The government asserts the search of the vehicle was constitutional and that Mr. Crawford's statements should not be suppressed. Docket No. 33.

## DISCUSSION

**A.   Whether the Search of Mr. Crawford's Vehicle Violated the Fourth Amendment—the Automobile Exception**

The usual rule under the Fourth Amendment is that a valid search warrant supported by probable cause must first be obtained before a search is conducted. California v. Carney, 471 U.S. 386, 390 (1985). There are, however, a number of exceptions to the warrant requirement, including the automobile exception. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989).

The Supreme Court has held that the "ready mobility" of automobiles creates an exigency that allows a warrantless search of an automobile where

probable cause exists to believe that the vehicle contains contraband or evidence of criminal activity. Labron, 518 U.S. at 940; Caves, 890 F.2d at 89. Aside from the mobility of cars, the automobile exception to the warrant requirement is also supported by the fact that citizens have a reduced expectation of privacy in an automobile because automobiles are subject to pervasive regulation. Labron, 518 U.S. at 940 (citing Carney, 471 U.S. at 390-391); Caves, 890 F.2d at 89.

"The act of looking through a car window is not a search for Fourth Amendment purposes because 'a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car.' . . . Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has right to be in close proximity to the vehicle." United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007) (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing Texas v. Brown, 460 U.S. 730, 740 (1983)), and citing United States v. Beatty, 170 F.3d 811, 814 (8th Cir. 1999)).

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there. Caves, 890 F.2d at 90. Probable cause requires "only a probability or substantial chance of criminal activity, not an actual

10

showing of such activity." United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (citing United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997), quoting Illinois v. Gates, 462 U.S. 213, 243-244 n.13 (1983)). When a search takes place without a warrant, the burden is on the government to demonstrate by a preponderance of the evidence that one of the exceptions to the warrant requirement is applicable. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

The government argues the discovery of the gun grip seen through the locked windows of Mr. Crawford's vehicle gave rise to probable cause to search under the automobile exception. The government also argues the smell of marijuana gave rise to probable cause to search.

**1.    Did Viewing the Gun Grip Give Rise to Probable Cause?**

Mr. Crawford suggests in his pre-hearing brief that the officers did not and could not possibly recognize the item they viewed through the windows of Mr. Crawford's vehicle as a gun grip. Docket No. 32 at p. 7. That suggestion is defeated by the evidence received at the hearing where Officers Olson and Buhr both testified the item was very clearly and immediately recognizable to them as a gun grip.

Even if the police recognized the item as a gun, Mr. Crawford also argues that police did not have probable cause to believe that a crime had been committed with the firearm because they did not at that time know that Mr. Crawford had been previously convicted of a felony and there was not

probable cause to believe he had used a gun in the crime reported on February 5. Id.

Mr. Crawford is correct about his first assertion. Police did not learn Mr. Crawford had a prior felony conviction until long after the search had occurred. But Mr. Crawford is mistaken about the second assertion.

The police *did* have evidence from three separate reporting persons that Mr. Crawford had a firearm that night and had threatened to use it to shoot Ms. Bryant. That, too, is a crime separate and apart from the status crime of being a felon in possession of a firearm. See SDCL § 22-18-1(4) (describing the crime of simple assault involving credible threats of bodily harm). The last report of Mr. Crawford possessing a firearm and threatening to use it against Ms. Bryant was made approximately three minutes before police effectuated the stop of Mr. Crawford. Given the very short time between the report of the offense and the traffic stop, and the fact that the traffic stop took place only a couple of blocks from the scene of the crime, it was probable that evidence of the crime (i.e. the gun) would be found in Mr. Crawford's vehicle. The three reports from three unrelated persons were credible and the fact that no one confirmed actually *seeing* a gun is beside the point. Dispatch broadcast to the officers that Ms. Bryant told dispatch Mr. Crawford had had a gun with him when he came back to her apartment for the second time. That is the relevant information the officers were working off of. Only later, after the search, did Ms. Bryant clarify that she heard a "click click" from the other side of her

apartment door when Mr. Crawford was outside threatening her and believed that sound came from a gun, but did not actually see a gun.

Probable cause to effectuate an arrest based on Mr. Crawford's use of the gun is distinct from probable cause to search his automobile for the gun. Police were in the process of investigating the February 5 events to determine if a crime had been committed. "Law enforcement officers have substantial latitude in interpreting and *drawing inferences from* factual circumstances" when investigating and determining whether to make a warrantless arrest or conduct a warrantless search. United States v. Richardson, ___ F.4th ___, No. 21-2741, 2022 WL 2840488 at *2 (8th Cir. July 21, 2022) (quoting United States v. Green, 9 F.4th 682, 690 (8th Cir. 2021)).

And probable cause does not require certainty. Probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity. United States v. Torres-Lona, 491 F.3d 750, 755-756 (8th Cir. 2007). There must be evidence which would "warrant a man of reasonable caution in the belief" that a crime has been committed. Wong Sun v. United States, 371 U.S. 471, 479 (1963).

The court concludes the automobile exception applies because, under the totality of circumstances known to police, it was probable that they would find evidence of the crime of assault inside Mr. Crawford's vehicle given the credible reports to police dispatch, the information relayed from dispatch at 20:39:17 that Mr. Crawford had returned to Ms. Bryant's apartment a second time with a gun (Exh. C at p. 3), the fact that only a few minutes had elapsed

between Mr. Crawford's second visit to Ms. Bryant's apartment and his apprehension, and the fact that Officers Olson and Buhr saw a gun grip through the locked windows of Mr. Crawford's vehicle.

### 2. Did the Odor of Marijuana Give Rise to Probable Cause?

The government asserts the smell of marijuana also gave rise to probable cause to search under the automobile exception. Mr. Crawford argues that the odor of marijuana did not give rise to probable cause allowing the police to search his vehicle. Docket No. 32 at p. 8. Mr. Crawford attacks the officers' credibility, pointing out that the doors and windows of Mr. Crawford's vehicle were closed and no marijuana was ever found during the search. Id. He also points out that Officer Buhr did not mention smelling marijuana in his initial interactions with Mr. Crawford and that no officer noted the smell until after Mr. Crawford refused consent to search. Id. But multiple officers on scene—Olson, Vanvoorst, and Buhr--reported smelling the odor of marijuana associated with Mr. Crawford's vehicle and testified to that fact.

At the hearing, counsel also argued that the presence of nearby vehicles could have been the source of the marijuana odor. But all the officers pointed to the driver's side of Mr. Crawford's vehicle as the strongest source of the odor and there were no vehicles near that side of Mr. Crawford's vehicle for a considerable distance—nearly the entire parking lot up to Minnesota Street on the driver's side of Mr. Crawford's car was empty. In addition, Officer Olson testified that the smell was "exponentially" stronger next to the driver's side of Mr. Crawford's vehicle than anywhere else.

Continuing to attack the officers' credibility, Mr. Crawford argues the fact that no urine or blood was taken from Mr. Crawford to test for drugs shows the officers were not truthful. But Mr. Crawford was not arrested for using drugs or for driving impaired, crimes that would require police to eventually prove in a courtroom that he had drugs in his system on February 5. It seems entirely logical to the court that police would not waste their time trying to document evidence that was unneeded to prosecute Mr. Crawford for the assaults committed on January 28 or February 5, which were the crimes he was arrested for.

Similarly, the court finds it inconsequential that no one called a K-9 which could detect marijuana to the scene. All the officers were trained in identifying the odor of marijuana, which is very distinctive, and they testified that they believed they were smelling marijuana. The court finds the evidence from the officers at the scene credible. The odor of marijuana gives rise to probable cause for a warrantless search under established Eighth Circuit case law.

In the Caves case, the officer smelled the odor of burnt marijuana on the person and the breath of the driver of a vehicle the officer had stopped for speeding. Caves, 890 F.2d at 90. No odor of unburned marijuana was smelled on the driver, nor did the officer detect any odor of marijuana of any kind emanating from the driver's vehicle. Id. Under these circumstances, the driver argued that the odor of burnt marijuana was evidence only that the driver had recently consumed marijuana; he argued that it did not give rise to probable

15

cause to believe that there was any marijuana in the car. Id. The Eighth Circuit rejected this argument, noting that the driver had "just emerged from a vehicle driven from another state several hundred miles away," that the driver had just spent several hours riding in the automobile just prior to the stop, that the hour was late, and that the totality of these circumstances, in addition to the odor on the driver, gave rise to probable cause to believe that there would still be unused marijuana in the vehicle. Id. at 91.

In United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000), the Eighth Circuit held that a strong smell of air freshener (a potential masking agent for the smell of illegal narcotics) coming from a vehicle, combined with the smell of burnt marijuana on the driver, was sufficient to give rise to probable cause for the search of the vehicle.

In Neumann, where the driver smelled of alcohol, lit a cigarette which the officer believed was being used to cover up the smell of alcohol, sat far away from the officer in the patrol vehicle up against the door, had a positive PBT, and admitting to drinking a beer in a town 60 miles away, the Eighth Circuit held that there was probable cause to believe that the driver consumed alcohol in the car and, thus, that a search for an open container in the car was justified. Neumann, 183 F.3d at 756. When the officer began searching the vehicle for open containers of alcohol, he smelled burnt marijuana, which in turn gave rise to probable cause to search the entire vehicle for drugs. Id.

The unifying analysis that ties McCoy, Neumann, and Caves together is *not* that the odor was emanating from the driver or from the car itself. Rather,

the unifying justification for the search in each case was the presence of facts and circumstances that gave rise to the inference that drugs or alcohol had been consumed in the vehicle itself or were stored there and, hence, that they would probably still be present. McCoy, 200 F.3d at 584 (strong smell of air freshener emanating from the car); Neumann, 183 F.3d at 756 (odor of alcohol coupled with driver's admission of having drunk a beer 60 miles away from the scene of the stop); Caves, 890 F.2d at 91 (fact that driver still smelled of marijuana and had been riding in the car for several hundred miles). See also United States v. Jennings, 2007 WL 2142260, No. *1 (8th Cir. July 27, 2007) (unpublished) (per curiam) (holding that odor of burnt marijuana emanating from passengers and from interior of car justified search pursuant to the automobile exception because probable cause existed to believe that marijuana had been used in the car). The facts in these cases gave rise to the inference that the car had been used to consume or store illegal drugs given the odor of marijuana on the driver or in the car itself. The issue under Caves, Jennings, McCoy, and Neumann is whether, given the totality of facts known to them, the officers on scene had probable cause to believe that there might be marijuana in Mr. Crawford's vehicle or evidence of the consumption of marijuana in the vehicle. The court concludes there was probable cause to search Mr. Crawford's vehicle based on the odor of marijuana. Further, that the automobile exception allowed that search to be conducted without a warrant.

**B.    Plain View Exception**

The government also seeks to justify the warrantless search of Mr. Crawford's vehicle under the plain view exception. Docket No. 33 at p. 9. The plain view exception to the warrant requirement is an independent justification for a warrantless search separate from the automobile exception. In order for the plain view exception to apply, (1) the item seized must be in plain view, (2) the officer viewing the item must be in his vantage point lawfully, and (3) the incriminating nature of the item must be immediately apparent. Horton v. California, 496 U.S. 128, 136-37 (1990).

Here the officers had a right to be in close proximity to Mr. Crawford's vehicle because they had reasonable suspicion or probable cause to believe he had committed an assault a very short time and very short distance away. From their vantage point close to Mr. Crawford's vehicle, the grip of the handgun was visible and its incriminating nature immediately apparent because three credible witnesses had reported unlawful behavior by Mr. Crawford involving the threatened use of a gun. Thus, the court concludes that under the plain view exception, the warrantless search of Mr. Crawford's vehicle was justified.

**C.    Search Incident to Arrest**

The government asserts yet a third justification for the warrantless search: the search incident to arrest exception. Docket No. 33 at pp. 8-9. Under that exception, "an automobile search incident to a recent occupant's arrest is constitutional: (1) if the arrestee is within reaching distance of the

18

vehicle during the search, **or** (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" Davis v. United States, 564 U.S. 229, 235 (2011) (emphasis added).

Here, *at the time the search was conducted*, Mr. Crawford was under arrest only for the January 28 crime, which involved a metal pipe, not a gun. So officers would have had to have reason to expect they would find evidence relative to the *January 28 assault* in order to search incident to arrest. No officer testified that they thought they would find evidence of the January 28 assault in the vehicle and that was the crime of arrest at the time of the search. Officer Smith later developed probable cause to support Mr. Crawford's arrest for the events of February 5, but that evidence did not come to light until after the search of the vehicle. The court concludes that the exception to the warrant requirement for searches incident to arrest does not support the search of Mr. Crawford's vehicle in this case.

## D.   Whether Mr. Crawford's Statements Should Be Suppressed

The only ground offered by Mr. Crawford for the suppression of his statements is the assertion that they are fruit of the tree of the unconstitutional search of his vehicle.[2] Because the court finds there was no Fourth Amendment violation in searching Mr. Crawford's vehicle, the

---

[2] At the hearing in this matter, counsel asked pointed questions of the officers about the fact that they continued to ask Mr. Crawford questions after he was in handcuffs. When the court inquired whether counsel was asserting a Miranda violation claim, counsel replied that she was *not* asserting such a claim because Mr. Crawford made no incriminating remarks in response to police questions. Accordingly, the court does not address other potential grounds for suppression of Mr. Crawford's statements.

19

statements cannot be the fruit of a constitutional violation. Because no other grounds are offered for the suppression of Mr. Crawford's statements, the court recommends denying the motion to suppress those statements.

## CONCLUSION

Based on the facts, law, and analysis discussed above, this magistrate judge respectfully recommends denying Mr. Crawford's motion to suppress [Docket No. 31] in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 4, 2022, *nunc pro tunc* August 3, 2022.

BY THE COURT:

*Veronica L. Duffy*

VERONICA L. DUFFY
United States Magistrate Judge